UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JONATHAN C. GARRIS          )
    Plaintiff,          )
                               )
        v.          )   Civil Action No. 1:15cv1343
                               )
COMMISSIONER OF SOCIAL SECURITY, )
    Defendant.          )

MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), Jonathan C. Garris ("plaintiff" or "claimant") seeks judicial review of the final decision of the Commissioner of Social Security ("defendant") denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-34. Both parties filed motions for summary judgment with briefs in support, which are now ripe for resolution. (Dkts. 10, 12-1, 16, 17.) On May 26, 2016, United States District Judge Liam O'Grady referred this matter, with the consent of both parties, to the undersigned United States Magistrate Judge. (Dkt. 15.) For the following reasons, Claimant's Motion for Summary Judgment (Dkt. 10) shall be DENIED and Defendant's Motion for Summary Judgment (Dkt. 16) shall be GRANTED.

I. PROCEDURAL BACKGROUND

Plaintiff filed his application for disability insurance benefits on November 15, 2010, alleging disability as of July

1

24, 1998. (Administrative Record[1] ("R.") 11, 155-58.) Plaintiff's claims were initially denied on April 14, 2011, and again upon reconsideration on November 27, 2012. (Id. at 11, 75-101, 105-07.) On January 22, 2013, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at 11, 108, 111-16.)

ALJ Michael A. Krasnow held a hearing on March 21, 2014, during which he received testimony from plaintiff, represented by counsel, and James Ryan, an impartial vocational expert. (Id. at 11, 27-74.) On May 13, 2014, the ALJ issued his decision, finding that plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act through December 31, 2003, the last date plaintiff was insured. (Id. at 11-22.) The Appeals Council for the Office of Disability Adjudication and Review ("Appeals Council") denied plaintiff's request for review of the ALJ's decision on August 14, 2015. (Id. at 1-3.) Having exhausted his administrative remedies, plaintiff filed a Complaint for judicial review on October 15, 2015. (Dkt. 1.) Defendant answered on December 15, 2015. (Dkt. 4.) The parties then filed cross-motions for summary judgment (Dkts. 10 and 16), and the matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether

---

[1] The certified administrative record was filed under seal on December 15, 2015, pursuant to Local Civil Rules 5(B) and 7(C)(1). (Dkt. 5.)

the Commissioner's decision was supported by substantial evidence in the record and whether the correct legal standard was applied. 42 U.S.C. § 405(g); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance. Hays, 907 F.2d at 1456. While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987), *superseded by statute on other grounds as stated in* Stroup v. Apfel, No. 96-1722, 2000 U.S. App. LEXIS 2750, at *12-13 (4th Cir. Feb. 24, 2000).

In reviewing for substantial evidence, the Court must examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). The correct law to be applied includes the Act, its implementing regulations, and controlling case law. See Coffman, 829 F.2d at 517-18. With this standard in mind, the Court next evaluates the ALJ's findings

3

and decision.

### III. ALJ's FINDINGS OF FACT AND CONCLUSIONS OF LAW

The ALJ is required to employ a five-step sequential evaluation in every Social Security disability claim analysis to determine the claimant's eligibility. 20 C.F.R. §§ 404.1520, 416.920. As noted above, the Court examines this five-step process on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence in the record. In accordance with the five-step sequential analysis, the ALJ in this case made the following findings of fact and conclusions of law.

First, plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of July 24, 1998, through his date last insured ("DLI") of December 31, 2003. (R. 13.) Second, through the DLI, plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine with lumbar radiculopathy, status-post laminectomy and obesity. (Id.) Third, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, through his DLI. (Id. at 14.) Fourth, through his DLI, plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §

404.1567(a), except that plaintiff could frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, and occasionally crawl, and with the additional limitation that plaintiff should avoid concentrated exposure to hazards, such as machinery and unprotected heights and parts. (Id. at 14-15.) As such, plaintiff was unable to perform any past relevant work. (Id. at 20-21.) Fifth, considering plaintiff's RFC, age, education, and work experience, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed through the DLI. (Id. at 21.) Therefore, the ALJ determined that plaintiff was not under a disability, as defined in the Social Security Act, at any time from July 24, 1998, the alleged onset date, through December 31, 2003, the date plaintiff was last insured. (Id. at 22.)

## IV. RELEVANT FACTUAL BACKGROUND

Plaintiff was 48 years old on December 31, 2003, his DLI. (R. 34-35.) Plaintiff has a high school education and worked for 20 years as a truck driver, loading, unloading, and driving 18-wheel tractor-trailers. (Id. at 38-42.) Plaintiff alleged disability since July 24, 1998, due to chronic pain, back problems, side effects from stroke, and diabetes. (Id. at 75.)

### A. Testimony at the Hearing before the ALJ

At the hearing before the ALJ on March 21, 2014, plaintiff testified that he fell down some steps at a Home Depot on July

5

24, 1998 while on the job, injuring his back. (R. 43-45.) As a result, plaintiff underwent back surgery in December 1998. (Id. at 44, 63.) Plaintiff stated that he then began taking medication for his pain and psychological issues, including Trazodone, Flexeril, and Oxycontin. (Id. at 48-51.) He also underwent physical therapy sessions three or four times, and he received approximately ten pain injections. (Id. at 52.) Plaintiff further testified that, up through 2003, he was able to walk with a cane for 20 to 25 feet, he could stand for about a half an hour, he could sit for ten to 15 minutes, and he could lift 15 to 20 pounds. (Id. at 53-55.) Plaintiff also stated that he could climb stairs, drive his automatic transmission car, go to the store, dress himself, do some laundry, cast a rod when he went fishing once a year, occasionally do his back extension exercises, and sit in the car for an hour and 45 minutes when his wife drove them to the beach house. (Id. at 37, 39, 53, 58-62.) However, plaintiff added that he had to sit and required assistance to shower, he could no longer stand enough to cook, he did not do any household cleaning or yardwork, he could not walk outside sufficiently to do cardio exercise, and generally he would stay laid up in his house, with his leg propped up on a pillow 10 to 12 hours per day, watching TV. (Id. at 53-54, 57-59, 61, 65-66.) Plaintiff further testified that he was in serious pain, especially his left leg, (Id. at 47, 64-65.)

6

At the administrative hearing, the vocational expert testified that an individual with plaintiff's RFC could perform light, unskilled occupations such as packaging worker, grading and sorting worker, and machine tender, as well as sedentary, unskilled occupations such as security worker, quality control worker, and order clerk. (R. 69-70.) The vocational expert further testified that all six of the above positions would permit a person to sit/stand at will and use a cane to ambulate. (Id. at 70-71.) The vocational expert also acknowledged that, if it were necessary for an individual to raise his/her leg about 18 inches or more off of the floor for an hour or so a day, that would preclude the person from competitive employment. (Id. at 71-72.)

### B. Medical Treatment Records through DLI

The medical records show that, after his fall at the Home Depot on July 24, 1998, plaintiff had pain in his left back and left upper thigh, for which he saw Dr. Donald C. Oxenhandler, M.D.[2] (R. 631.) Dr. Oxenhandler provided plaintiff a two-week work excuse and prescribed conservative care including physical therapy. (Id.) When plaintiff returned with no improvement, Dr.

---

[2] Except for a brief discussion by plaintiff of his diabetes and an episode of chest pain, the parties in their cross motions for summary judgment have focused on the facts regarding plaintiff's back injury and related impairment. Furthermore, plaintiff's assertions of error by the ALJ relate only to plaintiff's limitations due to his back condition. Consequently, the undersigned has limited this discussion to the facts surrounding plaintiff's back problems.

Oxenhandler extended plaintiff's work excuse and ordered a
lumbar MRI. (Id. at 630.) The MRI, performed on August 27, 1998,
revealed multilevel disease, multiple collapsed disks with
spondylosis, facet disease bilaterally in the lumbar spine,
diffuse degenerative changes and posterior protrusion at L1-L2,
degenerative changes at L4-L5, and left posterior herniation of
the L5-S1, possibly involving the nerve root. (Id. at 626-27.)
On September 17, 1998, plaintiff underwent an independent
medical examination by Dr. Bruce J. Ammerman, M.D., in
connection with plaintiff's workers' compensation claim. (Id. at
621.) Dr. Ammerman reviewed plaintiff's MRI, noting narrowing at
L1-L2, L4-L5, and L5-S1 with posterior protrusion to the left at
L5-S1, and found that plaintiff had evidence of symptomatic
lumbar radiculopathy. (Id.)

Based on plaintiff's request, Dr. Ammerman took over
plaintiff's care as of September 24, 1998, and prescribed
epidural blocks. (R. 620.) When plaintiff's back and leg pain
did not improve, Dr. Ammerman suggested surgery, to which
plaintiff agreed. (Id. at 619.) An MRI on December 20, 1998,
showed chronic degenerative changes but no evidence of recurrent
disc herniation at L4-L5, and a bulging disk at L5-S1 to the
left with suggestions of a fragment. (Id. at 613-15.) A partial
laminectomy of the extruded disc at plaintiff's left L5-S1 was
performed on December 22, 1998, after which plaintiff noted

marked improvement in his left leg discomfort, although
reporting some residual numbness and tingling. (Id. at 609-14.)
At this time, Dr. Ammerman stated that plaintiff was currently
disabled. (Id. at 609.)

On February 15, 1999, plaintiff returned to Dr. Ammerman
complaining of increased numbness and tingling in his left leg,
for which plaintiff was referred to physical therapy, and after
noting improvement, an aquatic program as well. (R. 604, 606-
08.) During this time, Dr. Ammerman opined that plaintiff
continued to be disabled from driving a truck, and an automatic
transmission would be appropriate for plaintiff's return. (Id.
at 608.) On April 26, 1999, plaintiff reported that he had
benefited from the aquatic program, and Dr. Ammerman stated that
he believed plaintiff was capable of returning to non-arduous
employment with a permanent lifting restriction of 15 to 20
pounds and the opportunity to change position as needed. (Id. at
597.) In June 1999, Dr. Ammerman completed a physical capacities
form for plaintiff, in which Dr. Ammerman stated that plaintiff
could sit up to two hours per day, stand or walk up to two hours
at a time and 4 hours per day, lift ten pounds frequently and 20
pounds occasionally, and could return to work that month. (Id.
at 595.)

After completion of the physical therapy and aquatic
programs, plaintiff experienced lower back spasms and lower left

9

leg pain in July 1999 after scrubbing his floor, at which time
Dr. Ammerman found evidence of recurrent lumbar radiculopathy.
(R. 593.) Dr. Ammerman advised plaintiff to remain off from work
for the next three weeks as he remained temporarily totally
disabled. (Id. at 592.) Because of plaintiff's continued pain,
plaintiff underwent a lumbar MRI in September 1999, which showed
multilevel facet joint degenerative change and small to moderate
diffuse disc bulges at L1-L2, L2-L3, L4-L5, and L5-S1. (Id. at
588-91.) Dr. Ammerman then prescribed three lumbar epidural
steroid injections, which plaintiff received in October 1999.
(Id. at 582-84, 586-87.) Although plaintiff "felt really good"
following the second injection, his pain returned after
beginning moderate exercise, and plaintiff continued to
experience lower back and left leg pain as of November 1, 1999.
(Id. at 581-82.) Later that month, plaintiff underwent a
myelogram and tandem CT scan which revealed a small diffuse disc
bulge at L4-L5, and a small disc bulge and degenerative changes
at L5-S1. (Id. at 355, 581.) Nerve studies in December 1999 also
showed left leg radiculopathy and post-laminectomy syndrome.
(Id. at 269.)

On March 30, 2000, Dr. Abraham Cherrick, M.D., plaintiff's
pain management doctor, concluded that plaintiff could return to
light duty work on a part-time basis of four hours per day,
sitting and standing for 30 minutes at a time and up to three

hours per day, pushing or pulling up to 25 pounds, and occasionally performing overhead work and bending at the waist. (R. 408.) On July 5, 2000, however, Dr. Ammerman advised plaintiff that, due to his pain medication, which decreased his ability to function adequately, plaintiff should remain off work until reevaluation. (Id. at 580.) Plaintiff returned to Dr. Ammerman on September 5, 2000 reporting pain and some depression. (Id. at 578.) Dr. Ammerman recommended that plaintiff discontinue his work hardening program, noting that it was not practical for plaintiff to return to driving a bus or truck, but Dr. Ammerman added that plaintiff was capable of performing an eight-hour day of sedentary work and that plaintiff was an excellent candidate for vocational rehabilitation. (Id. 578-79.) Plaintiff and Dr. Ammerman then again discussed these issues on October 10, 2000. (Id. at 577.) When plaintiff returned on November 13, 2000, he reported improvement and informed Dr. Ammerman that he had found a job driving a Fairfax connector bus for four hours in the morning and four hours later in the day. (Id. at 576.) Dr. Ammerman stated that he believed that was an appropriate position for trial, noting that plaintiff could lift up to 20 pounds if necessary. (Id.)

Plaintiff then suffered a flare-up of back pain with some sciatica in February 2001. (R. 575.) Dr. Ammerman recommended

11

conservative treatment and stated that plaintiff should not pursue employment at that time due to the flare-up. (Id.) When plaintiff noted continued pain on April 30, 2001, Dr. Ammerman altered plaintiff's medications and indicated that he anticipated plaintiff would be released to return to full-time sedentary work on June 1, 2001, so long as plaintiff had the opportunity to change positions and avoided repeated bending, stooping, or lifting greater than 10-15 pounds. (Id. at 574.) Follow up visits in July 2001, October 2001, and January 2002, showed little change in plaintiff's condition, though plaintiff had gained some weight despite trying to exercise. (Id. at 571-73.) Dr. Ammerman adjusted plaintiff's pain medications while noting that plaintiff continued to be unable to work. (Id.)

Plaintiff returned to Dr. Ammerman on June 9, 2003 amidst another flare-up of pain. (R. 570.) Dr. Ammerman increased plaintiff's pain medications, ordered a lumbar MRI, and stated that a determination as to work status would be made following the MRI. (Id.) The following day, Steven Skobel, CS-ANP, of Dr. Cherrick's office, examined plaintiff due to worsening pain, noting that bedrest seemed to help while activity worsened plaintiff's pain and determining that plaintiff had post laminectomy syndrome, S1 joint dysfunction, lumbar radiculopathy, and myofascial pain syndrome. (Id. at 562.) A physical examination of plaintiff by Dr. Cherrick on September

12

4, 2003 indicated limited lumbar mobility, guarding of lumbar
motions, and tenderness over the left S1 joint, for which Dr.
Cherrick recommended an injection. (Id. at 560-61.) A lumbar MRI
performed on September 15, 2003 showed a paramedian scar and
diffuse axial bulges at L5-S1, consistent with possible
herniation, and a significant bulge at L1-L2. (Id. at 568.) Dr.
Ammerman ordered a myelogram CT scan and informed plaintiff's
workers' compensation case manager on October 16, 2003 that
plaintiff was unable to work at that time. (Id. at 567-68.)

On October 23, 2003, plaintiff saw Dr. Cherrick, reporting
low back pain and some radicular left leg pain and noting that
he was unable to get the injection previously recommended. (R.
559.) On December 16, 2003, plaintiff complained of increasing
pain and Dr. Ammerman noted a slight limp. (Id. at 566.) A
lumbar myelogram on December 18, 2003 revealed anterior extra-
dural impressions at L1-L2 and L2-L3, while a CT scan of the
lumbar spine revealed a probable left lateral herniated disk at
L3-L4. (Id. at 564-65.) On January 5, 2004 — a few days after
plaintiff's DLI — plaintiff complained of severe pain in his
lower back and left thigh. (Id. at 563.) Dr. Ammerman discussed
plaintiff's options with him, and noted that plaintiff
"continues disabled." (Id.)

### C. Medical Opinions by Treating Physicians after DLI

On November 23, 2004, Dr. Ammerman performed a partial

13

hemilaminectomy on plaintiff at left L3-L4, as well as a mesial facetectomy and excision of a herniated disc at left L3-L4. (R. 370-71.) Subsequently, Dr. Cherrick wrote a To Whom It May Concern letter on April 28, 2005, stating that plaintiff was disabled during the calendar year 2004 while awaiting lumbar spine surgery. (Id. at 268.) Dr. Ammerman also wrote a similar letter on May 17, 2005, which stated that plaintiff had been totally disabled and unable to work since 2004. (Id. at 403.) Lastly, one of plaintiff's physicians completed a medical source statement on March 18, 2014. (Id. at 639-42.) Although the signature was illegible, plaintiff's attorney stated at the hearing before the ALJ that the statement came from Dr. Cherrick. (Id. at 30, 642.) The statement restricted plaintiff to sitting for 15 minutes before needing to alternate positions and for two hours in an eight hour workday, standing for 15 minutes before needing to alternate positions and for one hour in an eight hour workday, and provided for lying down or reclining in a supine position at two hour intervals for two total hours during an eight hour workday to relieve pain. (Id. at 639-41) The statement, which diagnosed plaintiff with post-laminectomy syndrome and lumbar radiculopathy, indicated that plaintiff's condition had persisted with those restrictions since August 1998. (Id. at 642.)

14

### D. State Agency Medical Opinions

On April 14, 2011, Dr. Paul Frye, M.D., a state agency physician, reviewed the evidence of record in plaintiff's file, including the medical evidence, and concluded that there was insufficient evidence to make a medical determination of disability from plaintiff's alleged onset date through his DLI. (R. 79-80.) Dr. Frye specifically noted that there were no physical exams on file showing muscle strength, gait, station, or range of motion, no x-rays, and no objective data from plaintiff's treating sources to support a decision of 12 months of disability. (Id. at 80.) That same day, Dr. Sandra Francis, Psy.D., a state agency psychologist, also reviewed the evidence and determined that there was insufficient evidence to substantiate the presence of an affective disorder. (Id. at 80-81.) On November 26, 2012, Dr. R.S. Kadian, M.D., and Dr. Nicole Sampson, PhD, also reviewed plaintiff's medical records and similarly concluded that insufficient evidence existed to establish that plaintiff was disabled prior to the DLI. (Id. at 85-95.)

### V. ANALYSIS

Plaintiff raises two issues on review. First, he argues that the ALJ failed to give full weight to plaintiff's treating doctor's opinion with regard to plaintiff's work restrictions. (Dkt. 10 at 1; Dkt. 12-1 at 25.) Second, plaintiff contends that

15

the ALJ failed to give proper consideration to plaintiff's testimony that he remained unable to work due to his pain and immobility. (Dkt. 12-1 at 25.) Each argument is addressed in turn.

## A. The ALJ Gave Proper Weight to Plaintiff's Treating Physician's Opinion

Plaintiff first contends that the ALJ erred by failing to assign greater weight to the opinion of plaintiff's treating physician, Dr. Ammerman, as it related to plaintiff's work restrictions. (Dkt. 10 at 1; Dkt. 12-1 at 25-26.)

Under the regulations, certain factors are considered to determine the weight given to a medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1527(c)(1)-(6). Generally, opinions from treating sources are given more weight than other opinions, and if it is found that a treating source's opinion on the issue of the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." Id. § 404.1527(c)(2). If a treating source's opinion is not given controlling weight, the above

16

factors are considered, as well as the length, nature, and extent of the treatment relationship and the frequency of examinations. Id. § 404.1527(c)(2)(i)-(ii). However, an ALJ may give less weight to a treating source's opinion when there is persuasive contrary evidence. Bishop v. Comm'r of Soc. Sec., 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curiam) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

In the instant case, in determining plaintiff's RFC, the ALJ assigned "some weight" to the opinion of Dr. Ammerman dated June 1999.[3] (R. 19.) The ALJ first noted that Dr. Ammerman opined at that time that plaintiff would be able to return to work fairly soon. (Id.) The ALJ then, ultimately, considered the limitations set forth by both Dr. Ammerman and Dr. Cherrick in deciding to reduce plaintiff's RFC to a limited range of sedentary work. (Id.) But, finding that some of the restrictions cited in Dr. Ammerman's opinion were not consistent with other evidence in the record, the ALJ assigned only "some weight" to Dr. Ammerman's opinion. (Id.) Upon a full review of the record, the undersigned concludes that the ALJ applied the proper legal standard, and that there is substantial evidence to support the ALJ's decision to assign "some weight," rather than controlling

---

[3] The ALJ appears to have committed a typographical error, stating in his opinion that Dr. Ammerman's opinion was from June 2009. (R. 19.) However, the document in the record to which the ALJ cites is actually dated June 1999, which notably falls between plaintiff's alleged onset of injury and his DLI. (Id. at 595.)

weight, to Dr. Ammerman's June 1999 opinion.

As the ALJ commented in explaining his decision to assign
"some weight" to Dr. Ammerman's opinion, plaintiff's imaging
statements and treatment notes indicate that plaintiff was able
to perform gross and fine manipulation without significant
difficulty. (R. 19, 595.) The ALJ also added that plaintiff's
physical examinations during the relevant period show some
limitation in range of motion and complaints of tenderness, but
that there was little evidence to support limiting plaintiff to
zero to two hours of sitting per day and two to four hours of
standing, which was Dr. Ammerman's conclusion in June 1999.
(Id.) Indeed, physical examinations of plaintiff between his
date of injury and DLI generally found moderate restriction of
motion with tenderness of the lumbar region, moderately positive
straight leg raising tests on the left while negative on the
right, an unremarkable gait (although a slight limp once), and
the ability to stand on his heels and toes. (Id. at 560, 566,
591, 593, 608, 621.) Plaintiff also responded positively to
physical and aquatic therapy and improved thereafter. (Id. at
597-98, 602, 604, 606.)

Moreover, the ALJ's determination of plaintiff's RFC is
consistent with various other opinions of Dr. Ammerman in the
record. On April 26, 1999, Dr. Ammerman stated that plaintiff
could return to non-arduous employment with a permanent lifting

18

restriction of 15 to 20 pounds and the opportunity to change position as needed. (R. 597.) Similarly, on September 5, 2000, Dr. Ammerman opined that plaintiff was capable of sedentary work and was an excellent candidate for vocational rehabilitation – a position which Dr. Ammerman reaffirmed on October 10, 2000. (Id. at 577-78.) Then, on November 13, 2000, Dr. Ammerman expressed that he believed driving a Fairfax connector bus for four hours in the morning and four hours later in the day was an appropriate position for plaintiff. (Id. at 576.) Additionally, on April 30, 2001, Dr. Ammerman stated that he anticipated plaintiff could return to full-time sedentary work on June 1, 2001, with restrictions on lifting, bending, or stooping, and the opportunity to change position. (Id. at 574.) These opinions are consistent with the ALJ's RFC determination, but are inconsistent with the stricter sitting and standing restrictions included in Dr. Ammerman's June 1999 opinion. Therefore, the undersigned concludes that the ALJ's RFC determination and decision to assign "some weight" to Dr. Ammerman's June 1999 opinion are supported by substantial evidence in the record and are consistent with the requirements of 20 C.F.R. § 404.1527(c).

In his decision, the ALJ also discussed the medical source statement dated March 18, 2014. (R. 20.) Because the signature was illegible, the ALJ could not attribute the statement to a specific physician, although the ALJ noted that the signature

19

appeared somewhat similar to the signatures of Dr. Ammerman and Dr. Oxenhandler. (Id.) As such, in the interest of fully addressing plaintiff's allegation that Dr. Ammerman's opinions should have been given greater weight, the undersigned will review the ALJ's assignment of weight regarding the medical source statement of March 18, 2014 as well.[4] Due to a lack of support in the record for the significant restrictions listed in the medical source statement, the ALJ assigned "little weight" to it. (Id.) Similar to the discussion above, the undersigned finds that the proper legal standard was applied and that there is substantial evidence in the record to support the ALJ's decision on this issue.

The March 18, 2014 medical source statement restricted plaintiff to sitting for 15 minutes before needing to alternate positions and for two hours in an eight hour workday, standing for 15 minutes before needing to alternate positions and for one hour in an eight hour workday, and provided for lying down or reclining in a supine position at two hour intervals for two total hours during an eight hour workday to relieve pain. (R.

---

[4] The undersigned notes that a change on page two of the medical source statement is notated with what appear to be the initials "AC." (R. 640.) This would seem to indicate that the statement is actually from Dr. Abraham Cherrick. Moreover, plaintiff's attorney stated at the hearing on March 21, 2014 that he was providing a 2014 medical source statement from Dr. Cherrick. (Id. at 30.) The undersigned agrees with the ALJ, however, that the signature on the statement does not appear similar to Dr. Cherrick's previous signatures. Because the ALJ addressed the statement as possibly coming from Dr. Ammerman, though, the ALJ's assignment of weight is arguably addressed by plaintiff's assertion of error, and thus the undersigned will review that decision.

20, 639-42.) The statement also noted that plaintiff's condition persisted with those restrictions since August 1998. (Id. at 20, 642.) In assigning the statement "little weight," the ALJ determined that none of the records of Dr. Ammerman, Dr. Oxenhandler, or Dr. Cherrick, independently or in combination, supported such severe restrictions. (Id. at 20.) Specifically, the ALJ remarked that Dr. Oxenhandler's records show that plaintiff did not demonstrate any significant neurological deficit, recommend conservative care as of June 28, 1998, and limit plaintiff's work excuse periods to two weeks for physical therapy. (Id. at 20, 630-31.) The ALJ further explained that Dr. Ammerman's records from February 15, 1999 show that plaintiff was able to stand on his heels and toes and suggested outpatient physical therapy and an exercise program, and throughout 1999 Dr. Ammerman stated that plaintiff was using pain medication occasionally, while also stating that plaintiff could return to non-arduous employment with a permanent lifting restriction of 15 to 20 pounds and the opportunity to change positions as needed. (Id. at 20, 581, 591, 593, 597, 604, 608.) Thus, as the ALJ detailed, these records are inconsistent with the restrictions contained in the medical source statement.

Moreover, none of the previous medical opinions in the record regarding plaintiff's work restrictions ever listed the need to lie down or recline for a total of two hours per day.

(R. 408, 595.) Additionally, as discussed above, plaintiff's physical examinations and Dr. Ammerman's various opinions stating that plaintiff could return to full-time sedentary work did not support the restrictions listed in Dr. Ammerman's June 1999 opinion. Accordingly, the stricter restrictions imposed in the March 18, 2014 medical source statement are similarly inconsistent with those records. Furthermore, Dr. Cherrick's opinion from March 30, 2000 also approved restrictions notably less severe than those in the March 18, 2014 medical source statement. (Id. at 408, 639-42.) As such, there was ample evidence in the record to support the ALJ's decision to assign "little weight" to the medical source statement dated March 18, 2014, and that conclusion is, therefore, consistent with 20 C.F.R. § 404.1527(c).

**B. The ALJ Gave Proper Consideration to Plaintiff's Testimony**

Plaintiff next argues that the ALJ failed to give proper consideration to plaintiff's testimony that he remained unable to work due to his pain and immobility. (Dkt. 12-1 at 29.)

Consideration of a claimant's symptoms, including pain, is governed by 20 C.F.R. § 404.1529. A claimant's statements about his/her pain or other symptoms alone do not establish disability. 20 C.F.R. § 404.1529(a). Rather, a two-pronged analysis is applied. First, "medical signs or laboratory findings" must show that the claimant has a medical impairment

22

that could reasonably be expected to produce the pain or symptoms alleged. Id. § 404.1529(b). Second, if such an impairment exists, the ALJ evaluates the intensity and persistence of the pain and symptoms and determines the extent to which they limit the claimant's capacity for work. Id. § 404.1529(c). In conducting the evaluation at step two, the ALJ will consider all available evidence, including objective medical evidence as well as other relevant factors such as the claimant's daily activities, the location, duration, frequency, and intensity of the pain or symptoms, and the claimant's medications and other treatments. Id.

Here, after reviewing the evidence in the record, the ALJ concluded that plaintiff had medically determinable impairments that could reasonably be expected to cause his alleged symptoms. (R. 16.) Next, the ALJ determined that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Id.) Based on the evidence in the record from July 24, 1998 to December 31, 2003, the ALJ then found that plaintiff's medical conditions caused some limitations in exertional functioning, but did not result in so severe a restriction of activities as to prevent him from engaging in all work. (Id.) Upon a full review of the record, the undersigned concludes that the ALJ applied the proper legal standard, and that there is substantial evidence to support the

23

ALJ's consideration of plaintiff's testimony and the ALJ's decision regarding plaintiff's RFC.

As recited above, in accordance with the process laid out in 20 C.F.R. § 404.1529, the ALJ properly looked first to whether plaintiff had medically determinable impairments that could reasonably be expected to cause his alleged symptoms, which the ALJ concluded did exist. (R. 15-16.) The ALJ then proceeded to evaluate the intensity and persistence of plaintiff's pain and symptoms and determine the extent to which they limited plaintiff's capacity for work. (Id. at 16-19.) At this point, the ALJ considered all available evidence, including plaintiff's testimony. (Id.) As such, the ALJ clearly applied the proper legal standard, that being the two-pronged analysis set forth in 20 C.F.R. § 404.1529. Plaintiff's argument that the ALJ did not afford proper consideration to plaintiff's testimony therefore boils down to a contention that the ALJ's determinations as to plaintiff's RFC and the credibility of his testimony were not supported by substantial evidence. (Dkt. 12-1 at 29-30.)

As the ALJ noted in considering plaintiff's testimony and its credibility, plaintiff retained the ability to engage in certain activities of daily living. (R. 19.) For example, the ALJ specifically highlighted that plaintiff could go fishing periodically and cast a fishing pole, and he could also do

24

laundry. (Id. at 19, 59-60.) Plaintiff also stated that he could regularly climb the stairs in his home, drive his car every day, go to the store, dress himself, occasionally do his back extension exercises, and sit in the car for an hour and 45 minutes when his wife drove them to the beach house. (Id. at 37, 39, 53, 58-62.) These statements are inconsistent with plaintiff's contention that his pain and immobility precluded him from all gainful work activity. In contrast, the above statements support the ALJ's conclusion that plaintiff had the RFC to perform sedentary work with certain exceptions.

Additionally, the ALJ pointed out that plaintiff's physicians had not precluded him from all activity during the relevant period. (R. 19.) For example, in relation to his worker's compensation claim, Dr. Ammerman stated that plaintiff was an excellent candidate for job training/rehabilitation for sedentary work. (Id. at 19, 577-78.) Also relevant, plaintiff's doctors prescribed, and plaintiff responded positively to and improved following, physical and aquatic therapy. (Id. at 597-98, 602, 604, 606.) The ALJ also looked to plaintiff's imaging studies and treatment records, which as discussed above regarding the ALJ's consideration of Dr. Ammerman's opinion, support the ALJ's RFC determination. (Id. at 19, 574, 576, 591, 593, 597, 608, 621.) Notably, the ALJ did find that the imaging studies and treatment records partially supported plaintiff's

alleged difficulties performing physical activity, and the ALJ reduced plaintiff's RFC accordingly. (Id. at 19.) However, these records are not wholly consistent with plaintiff's contention that he could not engage in any gainful work activity, and as such they support the ALJ's decision to find plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms not entirely credible.

Furthermore, plaintiff in his Memorandum in Support of his Motion for Summary Judgment emphasizes his testimony that he would lie down with his leg propped up for ten to twelve hours per day. (Dkt. 12-1 at 29-30; R. 54, 65.) Plaintiff thus highlights the vocational expert's testimony that an individual could not engage in competitive employment if it was necessary for that individual to prop his/her leg up 18 inches or more for an hour or so per day. (Dkt. 12-1 at 30; R. 71-72.) However, of the medical opinions in the record, only the March 18, 2014 medical source statement included a specific restriction relating to lying down or reclining, and the undersigned has already discussed that the ALJ's determination to afford that statement "little weight" was supported by substantial evidence. (R. 408, 595, 640-41.) Moreover, none of the medical opinions include the restriction that plaintiff had to prop his leg up 18 inches or more for an hour or so per day. (Id.)

Finally, the undersigned emphasizes that, when evaluating

the intensity and persistence of a claimant's pain and symptoms and determining the extent to which they limit the claimant's capacity for work, 20 C.F.R. § 404.1529(c) requires the ALJ to consider all available evidence. Here, the ALJ considered, and the undersigned has reviewed, (1) objective medical evidence, namely plaintiff's imaging studies, physical examinations, and other treatment records, (2) plaintiff's testimony as to his daily activities, (3) plaintiff's testimony and reports to physicians regarding the location, duration, frequency, and intensity of his pain and symptoms, and (4) the medications plaintiff was taking and other treatments that he underwent. (R. 15-19.) In that light, the undersigned concludes that there is substantial evidence in the record to support the ALJ's consideration of plaintiff's testimony and the ALJ's decision regarding plaintiff's RFC.

## VI. CONCLUSION

For the reasons set forth above, the undersigned Magistrate Judge finds that the ALJ's decision is supported by substantial evidence and does not contain legal error. Therefore, Claimant's Motion for Summary Judgment (Dkt. 10) shall be DENIED and Defendant's Motion for Summary Judgment (Dkt. 16) shall be GRANTED. An appropriate order shall issue.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
THERESA  CARROLL  BUCHANAN
UNITED  STATES  MAGISTRATE  JUDGE

September 1, 2016
Alexandria, Virginia